320 P.2d 653

**G. T. RUMMELL, H. M. Hardin, Mathew P. Rowe and Roy M. Eidal, doing business as LaSalle Mining Company, a partnership, Plaintiffs and Appellants,**

v.

**K. R. BAILEY, Jr., and Jolene Bailey, husband and wife; E. J. Hall and Ruth Hall, husband and wife; Milton C. Nielson and Estella Nielson, husband and wife; F. G. McFarlane and S. R. Hullinger, Defendants and Respondents.**

No. 8622.

Supreme Court of Utah.

Jan. 23, 1958.

Clair M. Senior, Salt Lake City, Therald N. Jensen, Price, Eugene H. Mast, Grand Junction, Colo., for appellants.

Duane A. Frandsen, Price, Dean E. Conder, Salt Lake City, Donald T. Adams, Monticello, for respondents.

CROCKETT, Justice.

Plaintiffs sued to quiet title to certain mining claims in what is known as the White Canyon area east of the Colorado River in San Juan County. The defendants set up as a defense that they had made prior valid mining locations on the same properties and counterclaimed to quiet title in themselves. The trial court found the

issues in favor of the defendants and entered judgment thereon, from which the plaintiffs appeal.

The evidence establishes that the defendants made their locations on the disputed properties (except one claim: Cedar Mesa No. 5, to be dealt with later) on or before April 2, 1953; whereas the plaintiffs made their locations in September of that year. The defendants being prior in time, their rights would be paramount to the claims of plaintiffs, if defendants' locations are otherwise valid.

The basis of plaintiffs' attack is that when defendants made their locations they had not complied with the requirement of the statute of the United States,[1] nor of the State of Utah,[2] with respect to lode mining claims, that there must be a " * * * discovery of the vein or lode within the limits of the claim located."

The question we here confront is what constitutes discovery of a "vein or lode." The language of the statute above quoted seems plain enough, but as is the case with many general statements of law, difficulties are encountered in applying it to specific circumstances.[3]

It must be appreciated that under the common generality, (which is almost but not quite universally true) that matter is divided into three categories: animal, vegetable and mineral, a very high proportion of the substances of the earth are in that sense "mineral." For instance, compounds of sodium, carbon, the silicons and other such commonly occurring minerals are widely distributed over the earth's crust. The discovery necessary under the mine location statutes is not satisfied by the discovery of "mineral" in that very broad sense. If it were, there would be justification for making mine locations on virtually every part of the earth's surface. That is the very thing the statutory requirement is aimed at: i. e. to prevent the "appropriation of presumed mineral ground for speculation purposes;"[4] to hold it on the chance that it may prove to have valuable minerals, but without any bona fide intent to develop the property. Accordingly, the terms are construed to refer to metals[5] and to other minerals[6] of some actual or potential commercial value and the requirement of their discovery is usually referred to in mining parlance as the discovery of "mineral in place."

1. 30 U.S.C.A. § 23.
2. U.C.A. 40-1-1.
3. Cf. Book v. Justice Mining Co., C.C., 58 F. 106; Burke v. McDonald, 3 Idaho, Hasb., 296, 29 P. 98; Harrington v. Chambers, 3 Utah 94, 1 P. 362; see, also: 9 Wyo. Law Journal, p. 214, 27 Rocky Mtn.L.Rev., p. 404.

4. 43 C.F.R., Sec. 185.12 (1949).
5. Grand Central Min. Co. v. Mammoth Min. Co., 29 Utah 490, 83 P. 648.
6. Nephi Plaster & Mfg. Co. v. Juab County, 33 Utah 114, 93 P. 53, 14 L.R.A., N.S., 1043.

■■ We are in accord with the contention of appellants that the mere possibility that mineral exists would not provide a proper foundation for the location of a mining claim; and that this is so even though there may be geological evidence indicating the likelihood of the existence of mineral. Nor are we disposed to disagree with the authorities to the effect that there must be something more than mere traces or slight indications of ore which might give rise to speculation or conjecture that mineral in commercial quantities may there exist.[7]

■ With respect to just what indications of ore are necessary, it is to be kept in mind that in the instant case the problem is somewhat different from the usual mining situation because the mineral with which we are primarily concerned is uranium. It has the rare characteristic of being an unstable element: that is, there is a continuous change occurring in its atoms, resulting in radio activity. The "radiation" therefrom may be detected by Geiger counters, scintillators, and other radiometric instruments sensitive to it, which, it is well known, are quite universally used and relied upon by miners prospecting for it because of this singular characteristic of uranium bearing

ores. We deem it entirely legitimate to rely upon such indications as one of the means for locating uranium. They must, of course, relate to actual uranium mineralization in the claim located, and not to radio activity in the atmosphere, nor to the slight amount which may be detected practically any place (particularly in our locality during and following the government's experimental nuclear explosions in our neighboring state of Nevada).[8]

■■ The statute requiring discovery of the "vein or lode" within the claim must be construed in accordance with its purpose which is to foster and encourage the discovery and development of mineral resources by providing a practical method of procedure for those who in good faith desire to search out and develop such resources in the public domain. To this end the courts have been quite liberal in sustaining discoveries in favor of the first locator of a mining property.[9] This is particularly so where the issue arises between him and another prospector who subsequently attempts to claim the same property.[10] We have heretofore given approval to this view[11] and the doctrine is generally accepted, as reflected in the statement of the eminent authority on mining law, Lindley: "The

7. Iron Silver Min. Co. v. Mike & Starr, etc., Min. Co., 143 U.S. 394, 430, 12 S.Ct. 543, 36 L.Ed. 201; United States v. Standard Oil Co. of California, D.C., 20 F.Supp. 427; see also Whiting v. Sharp, 17 Wyo. 1, at page 19, 95 P. 849; Cleary v. Skiffich, 28 Colo. 362, 368, 65 P. 59.

8. See the discussion in Smaller v. Leach, Colo., 316 P.2d 1030.
9. Ambergris Min. Co. v. Day, 12 Idaho 108, 85 P. 109.
10. Steele v. Tanana Mines R. Co., 9 Cir., 148 F. 678, 680.
11. Grand Central Min. Co. v. Mammoth Min. Co., see footnote 5, supra.

tendency of the courts is toward marked liberality of construction where a question arises between two miners who have located claims upon the same lode, or within the same surface boundaries, * * *." [12]

■■ Notwithstanding the fact that we recognize that the statute requires some discovery of mineralization in place on the claim, as distinguished from float or imported material, it need only be such as would lead a miner to pursue such indications with a reasonable expectation of finding ore. The term "lode" as used by miners is a variation of the verb "lead" and such is its meaning in connection with the above statute.[13] We think that the correct doctrine is that there must be a discovery within the confines of the claim of some mineralization of a nature that has actual or potential value. It need not be of any particular assay or richness in quality, nor any specified amount in quantity, nor need it be sufficient that it would immediately pay mining expenses.[14] The only essential is that the discovery must be of such significance that a practical, experienced miner of prudence and judgment would deem it advisable to pursue the vein or "lead" thus furnished and to expend further time, effort or money in attempting to develop the property as a mine.[15]

■ In applying the above test it is to be kept in mind that the prospector may take into account not only the mineral found and the indications thereof, but the geology, the locations of other known ore bodies or mines in the area, the opinions of miners, geologists and other experts, and any other information which mining operators regard as factors having a bearing upon the possibility of developing a mine, [16] and in the case of uranium he may, of course, consider the Geiger count.

Against the background of the foregoing principles we turn to the record for the purpose of determining whether the nature of the discovery relied upon by the defendants in locating their claims meets the requirements hereinabove set out.

In support of their opposition to the finding that defendants made a discovery the plaintiffs rely primarily upon the testimony of Dr. W. Lee Stokes of the University of Utah Department of Geology, who testified both as a geologist and as a practical miner. He minimized the significance of the indications of mineral defendants found in the surface of the claims, and also the Geiger count evident there. He classified the later discovery of a valuable uranium deposit in the shinarump formation, several strata lower, as a mere happenstance and in no way connected with the mineral evi-

12. Lindley on Mines, Vol. 2, Sec. 336, p. 765 (3d Ed.).

13. Harrington v. Chambers, 3 Utah 94, 1 P. 362.

14. See Grand Central Min. Co. v. Mammoth Min. Co., footnote 5, supra.

15. Ibid., footnote 11.

16. Erhardt v. Boaro, 113 U.S. 527, 5 S.Ct. 560, 28 L.Ed. 1113; Copper Globe Min. Co. v. Allman, 23 Utah 410, 64 P. 1019.

dent to defendants. It is to be noted that the hypothetical question posed to him was based upon the surface indications only. In response thereto he gave his opinion that they were not sufficient to justify pursuit of ore on the properties because a miner "* * * would *probably* lose money trying to mine that kind of material." (Emphasis ours.)

On cross-examination Dr. Stokes admitted that on the basis of the indications in the area he would have advised the Atomic Energy Commission, often referred to as A.E.C., to do exploratory drilling because of the need for uranium and the fact that it had sufficient funds to carry on such work. This would seem to indicate that a miner's prudence must be geared somewhat to his bank account, a realism of which we are all, sometimes too painfully aware. Evidence was also elicited through Mr. Frank H. McPherson, who demonstrated that the Geiger count on the San Juan County Court House lawn at Monticello was higher than some evidence showed the count to be in the Mossback formation on the surface of these claims.

Looking at the defendants' side of the coin, a quite different picture is disclosed. There is the testimony of Milton C. Nielson, one of the defendants, that he found indications of mineralization, including copper in a dome-like formation described as a sandstone lens, called the "Mossback"; and further, that he obtained a significant reaction on his Geiger counter showing the presence of uranium on these properties. He also took into consideration the geology of the area, the thickness of the sandstone lens and the appearance of channeling which is an important factor in searching for uranium because that mineral, being soluble in hot water, is found in deposits along ancient water courses, especially in the shinarump strata where this ore lies. Of further significance to the locators was the fact that in that strata on both the east and west sides of these claims ore bodies had been found and one of them was a producing mine, which they undoubtedly regarded as suggesting a strong likelihood that the channel of the ancient stream bed went through these claims.

A cogent argument that such factors would reasonably motivate a prudent prospector to pursue the mining possibilities of the property lies in the fact that the defendants elected to locate them and do their assessment work and negotiated with the A.E.C. to do exploratory drilling upon them, which in fact led to the later discovery of a rich ore body.

Further testimony supporting defendants' position is that of Leland Davis, also a graduate geologist and practical miner of some years' experience. Asked if the indications described would justify the expenditure of time and money in exploration and development of the claims, he answered:

A: "The area within the channel reflection, which is an important indication for uranium mineralization in that particular area is definitely a key to a miner or a prospector to go further [in] developing on this particular property. And I definitely would agree, of course, with the amount of mineralization noted and the channel conditions noted there that further development work would be certainly a feasible thing for a prospector to do."

It is appreciated that such opinions must not be merely naked conclusions but must be based upon some reasonable foundation in fact.

■■■ The question whether there is a discovery of mineral sufficient to meet the statutory requirement is one of fact. The rule of review of issues of fact is that all of the evidence and every inference and intendment fairly arising therefrom should be taken in the light most favorable to the finding made by the trial court. [17] And if when so viewed there is substantial support in the evidence for the finding made, it will not be disturbed.[18]

From the very nature of prospecting for mines it is exigent that considerable latitude be indulged in applying the rules herein discussed. There are few areas of human endeavor where chance plays as important a role as in mining. Many of the richest mines ever developed were passed over, not only by laymen, but by miners, and sometimes by experts as not being worth the effort to mine. Yet someone with more vision, or faith, or industry, or capital, or a combination of them, recognized in the indications present "the tide in the affairs of men, which taken at the flood, leads on to fortune," and seizing the opportunity, with pluck and persistence, and perhaps smiled upon by the goddess of luck, went on to success. This field of uranium with which we are concerned is no exception. Dr. Stokes himself admitted on cross-examination that he had many times passed over the fabulous multimillion dollar Mi Vida Uranium Mine of Mr. Charles Steen without considering the area to be worth locating, as indeed had many others.

The fact that the valuable ore body later found on these claims was an entirely separate ore body and in no way connected with the original surface findings is of no import. Once a valid location is made, the locator acquires the claim and all mineralization within its confines.

■■ From our survey of the evidence in the light of the principles hereinabove discussed, we cannot say that the trial court's finding that there was sufficient dis-

17. Jensen v. Logan City, 96 Utah 53, 83 P.2d 311; Toomer's Estate v. Union Pac. R. Co., 121 Utah 37, 239 P.2d 163.

18. Nokes v. Continental Min. & Milling Co., 6 Utah 2d 177, 308 P.2d 954.

covery to meet the requirements of the statute is not supported by substantial evidence. Consequently it must be sustained.

Affirmance of the determination that the defendants made a valid prior discovery and location of their claims obviates the necessity of considering other questions centering around whether the filing of an oil and gas lease application by a third party with the Department of the Interior in July, 1953, covering this ground, withdrew it from mining location. However, there remains the question of one claim; that is Cedar Mesa No. 5 with respect to which the facts are different.

■ The defendants located the latter claim on December 15, 1953, about eight months after their other claims had been located. It conflicts in part with plaintiffs' claim, Red Canyon No. 9, which was located early in September. Defendants challenge the location of the latter claim, averring that the discovery was not within its boundaries, as the law requires. No such issue was contested at the trial. Where a mining claim has been located, it will ordinarily be presumed that the locator complied with the law and made a discovery,[19] and the burden would be upon the defendants to affirmatively show there was no such discovery, which they have not done.

■ ■ Defendants also assail the validity of Red Canyon No. 9 because, on plaintiffs' claims, which were actually located early in September, 1953, the notices of location were back-dated to August 18, 1953. (This, incidentally, is the date the A.E.C. completed its first drill hole find into the rich ore body in this area). In spite of plaintiffs' prior location, Cedar Mesa No. 5 was included in the claims in which title was quieted in the defendants. This was apparently on the ground that the plaintiffs' claim was invalid because of fraud in back-dating the location notices.

In examining this fraud question, the important point is that the back-dating in no way prejudiced the defendants' position, since the plaintiffs' actual date of location, September, 1953, was several months before defendants' location in December anyway. Had this back-dating placed the plaintiffs' location date prior to defendants', the latter would have cause to complain. But the defendants cannot prevail on the issue of fraud here for the reason that injury to the complaining party is an essential element of it.[20] Insofar as defendants are concerned, the plaintiffs' back-dating was merely "fraud in the air."

What effect the back-dating may have had on the validity of the plaintiffs' claims as to the government or other parties is not

19. See Allen v. Laudahn, 59 Idaho 207, 81 P.2d 734.

20. Guaranty Mortgage Co. v. Flint, 66 Utah 128, 240 P. 175; Kinnear v. Prows, 81 Utah 135, 16 P.2d 1094.

material here. Since the plaintiffs' actual location date of Red Canyon No. 9 was ahead of the defendants' on this one claim, Cedar Mesa No. 5, as between these parties, plaintiffs are entitled to prevail and have title to their Red Canyon No. 9 quieted in them insofar as it conflicts with the later located Cedar Mesa No. 5. As to that claim, the judgment is ordered so modified, and as to the other eight claims: Maybe Nos. 1, 2, 3, 4 and Red Fry Nos. 1, 2, 3, 4 the judgment quieting title in the defendants is affirmed. The parties to bear their own costs.

McDONOUGH, C. J., and WADE and WORTHEN, JJ., concur.

HENRIOD, J., concurs in result.